# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

THERESA M. GILBERT,  
Plaintiff,

vs.

COMMISSIONER OF  
SOCIAL SECURITY,  
Defendant.

Case No. 1:17-cv-144  
Barrett, J.  
Litkovitz, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff Theresa M. Gilbert brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of errors (Doc. 10), the Commissioner's response in opposition (Doc. 13), and plaintiff's reply memorandum (Doc. 18).

## I. Procedural Background

Plaintiff filed her applications for SSI and DIB in January 2013, alleging disability since April 13, 2010 due to insulin-dependent diabetes mellitus, visual problems, gastroparesis, peripheral neuropathy, uncontrolled hypertension with swelling in her hands and feet, and borderline intellectual functioning.[1] These applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was afforded a hearing before administrative law judge ("ALJ") Billy Thomas on June 16, 2015.[2] Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing. On September 25, 2015, ALJ Thomas

---

[1] Plaintiff previously filed applications for disability benefits in 1997 and 2009. These applications were denied initially and not appealed. (Tr. 13). Plaintiff also filed applications for SSI and DIB in May 2010. (*Id.*). These applications were denied initially and upon reconsideration. (*Id.*). ALJ Kenyon issued a written decision on August 9, 2012 denying her applications. (Tr. 73-81).

[2] At the hearing, plaintiff amended her alleged disability onset date to August 10, 2012. (Tr. 13).

issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

2

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

Plaintiff previously filed applications for SSI and DIB in 1997, 2009, and 2010. (Tr. 13). In rendering his decision on plaintiff's subsequent SSI and DIB applications, ALJ Thomas recognized he was bound under principles of administrative res judicata by ALJ Kenyon's prior findings as to plaintiff's residual functional capacity ("RFC") "unless new and additional evidence or changed circumstances provide a basis for a different finding." (*Id.*) (citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997); *Dennard v. Sec'y of H.H.S.*, 907 F.2d 598 (6th Cir. 1990); Acquiescence Rulings (AR) 98-4(6) and 98-3(6)). ALJ Thomas determined that plaintiff's RFC is "now more limited than determined in the prior administrative law judge decision, and thus departure from the RFC found in the prior ALJ decision is warranted."[3] (*Id.*). ALJ Thomas applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2012.

---

[3] ALJ Kenyon previously found that plaintiff had the RFC for light work with the following exceptions: "(1) no climbing of ladders, ropes, or scaffolds; (2) no work around hazards such as unprotected heights or dangerous machinery; (3) no driving of automotive equipment; (4) no operation of foot controls; (5) frequent use of the hands for handling and fingering; and (6) no jobs involving reading, writing, or math." (Tr. 76).

3

2. The [plaintiff] has not engaged in substantial gainful activity since August 10, 2012, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: diabetes, depression, and borderline intellectual functioning (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she should not use ladders, ropes, or scaffolds; and should not be exposed to hazards. The [plaintiff] should not drive or operate foot controls. She is limited to frequent handling and fingering. She can only occasionally balance, and requires the use of a cane. The [plaintiff] is limited to simple, routine, repetitive work with no strict production pace required. She should have no more than occasional changes to her job duties, and should not perform work that requires reading, writing, or arithmetic.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[4]

7. The [plaintiff] was born [in] . . . 1974 and was 38 years old, which is defined as a younger individual age 18-44, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the [plaintiff]'s past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[5]

---

[4] Plaintiff has past relevant work as a dietary aide and laborer. (Tr. 22).
[5] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative jobs such as inspector (700 jobs regionally, 14,000 jobs nationally); hand packer (1,000 jobs regionally, 22,500 jobs nationally), and assembler (1,600 jobs regionally, 30,000 jobs nationally). (Tr. 23, 63).

4

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from August 12, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 16-23).

**D. Medical Evidence**

*i. Mental Health Evidence*

Plaintiff received special education schooling as a child. (Tr. 326-28). The evidence of record includes an "Evaluation Team Report" completed by plaintiff's school psychologist in 1990 when plaintiff was in ninth grade and fifteen years old. (*Id.*). The report reveals that plaintiff scored a full scale IQ of 69 in the Weschler Intelligence Scale for Children Revised. (Tr. 326). This was noted to be a "significant drop in her intelligence quotient as compared to her last evaluation results." (Tr. 327).[6] Plaintiff's reading skills were at a first grade level, her mathematics skills were at a fourth grade level, and her written skills were at a second grade level. (*Id.*). Plaintiff was evaluated to have a developmental age of 6-11. (Tr. 327). Her school psychologist concluded that she functioned within the low borderline range of cognition. (Tr. 328).

Plaintiff received mental health treatment at Community Behavioral Health from March 2014 through March 2015. (Tr. 630-702). On April 10, 2014, a mental status exam revealed that plaintiff had a logical thought process, euthymic mood, full affect, and cooperative behavior. (Tr. 698). Plaintiff reported feelings of depression and wanting to get prescription medications to address her symptoms. (Tr. 685). She reported that she enjoyed bowling and watching movies. (*Id.*). Plaintiff reported nutritional/eating pattern changes, pain management, depressed mood, bereavement issues, traumatic stress, inattention, mood swings/hyperactivity, sleep

---

[6] The ALJ noted that no prior or subsequent testing results were in the record and he could not make a determination as to the validity of the single IQ test from 25 years ago. (Tr. 20).

5

problems, substance use/addiction, psychosocial stressors, and pertinent health issues of type 2 diabetes and neuropathy. (Tr. 689-90). Plaintiff also reported pulling her hair out for approximately two years. (Tr. 690). Plaintiff was diagnosed with major depressive disorder, trichotillomania, and recurrent depressive psychosis. (Tr. 692-93). Plaintiff was assigned a global assessment of functioning ("GAF") score of 57. (Tr. 693).

Progress notes from May 2014 indicate that plaintiff "responded well" to the intervention. (Tr. 679). During a June 2014 mental status examination, plaintiff had a depressive/nervous mood, was mildly constricted, and had brief cathartic tearfulness. (Tr. 674). Her thought process was organized and coherent/logical, and her behavior was cooperative and pleasant. (*Id.*). Plaintiff reported depression, poor sleep maintenance, and compulsive skin and hair pulling. (*Id.*). Examination findings from July 2014 remained relatively unchanged. (Tr. 664-66). Notes from an August 2014 report indicate that plaintiff "presented with mild/moderate lessening in clinical depressive/affective instability and vegetative [symptoms]." (Tr. 661). In September 2014 and October 2014, plaintiff reported that her prescribed medications worked well. (Tr. 656, 654). In November 2014, plaintiff was loud and tearful when discussing her history of abuse throughout the session. (Tr. 650-51). In January 2015, plaintiff was slightly agitated and nervous during the therapy session. (Tr. 642-43). Her demeanor and cooperation improved after frequent questioning. (Tr. 643). Plaintiff's mood was euthymic/full and she exhibited good insight and judgment. (*Id.*). There was no change in her diagnosis. (*Id.*). During her session in March 2015, plaintiff had an irritable affect and began breathing heavily and crying while discussing family issues and issues about prior domestic abuse. (Tr. 631).

On March 13, 2013, Dr. Natalie DeLuca, Ph.D., conducted a psychological evaluation at the request of the Social Security Administration. (Tr. 493-99). Plaintiff's chief complaint was

6

her learning disability and diabetes. (Tr. 493). During the mental status examination, plaintiff had an agitated manner and cried at times. (Tr. 495). She cooperated and demonstrated good motivation. (*Id.*). Plaintiff described her mood as "stressed" and appeared depressed with a constricted affect. (*Id.*). Plaintiff showed limitations in concentration, attention, and memory due to limited intellectual functioning. (Tr. 496). During a brief cognitive exam, plaintiff could recall the days of the week forward and backward, but was unable to perform serial threes and could only recall one of four items after a five-minute delay, and was unable to perform simple mathematical calculations. (*Id.*). Dr. DeLuca diagnosed plaintiff with depressive disorder and assessed an overall GAF score of 50, indicating a serious to moderate mental impairment. (*Id.*). Dr. DeLuca concluded that by plaintiff's own reports, she was able to perform simple, routine work in prior jobs. (Tr. 497). DeLuca noted that plaintiff reported no difficulty relating to others at work. (Tr. 498). Dr. DeLuca noted that "[s]tressor and depressive symptoms may create some difficulties for her in terms of interpersonal functioning, but overall she appears capable of responding within appropriate limits to others in a work setting." (*Id.*). Dr. DeLuca concluded that plaintiff has limited coping skills and her cognitive resources are limited as she was without treatment for her mental health concerns.[7] (*Id.*). Dr. DeLuca opined that plaintiff would be limited in her ability to manage the stress associated with work. (*Id.*).

ii. *Physical Evidence*

In January 2013, plaintiff visited the emergency room and reported feeling sick with elevated blood sugar. (Tr. 354). Plaintiff reported that she was not taking her insulin regularly. (*Id.*). She reported feeling better after receiving treatment for the elevated blood sugar. (*Id.*). Plaintiff was admitted to the intensive care unit for two days for diabetic ketoacidosis and acute

---

[7] Dr. DeLuca conducted the consultative psychological evaluation before plaintiff began treatment with Community Behavioral Health.

7

renal failure. (*Id.*). Plaintiff received discharge diagnoses of improved diabetic ketoacidosis, improved acute renal failure, uncontrolled type 1 diabetes mellitus, uncontrolled hypertension, and noncompliance. (Tr. 364).

Plaintiff treated with family medicine physician Dr. Thomas Sargero, M.D., from September 2012 through April 2015 for diabetes, peripheral neuropathy, depression, swelling in the hands and feet, hyperlipidemia, boils and abscesses, and bronchitis. (Tr. 500-13, 618-629, 703-08). In April 2013, plaintiff reported to Dr. Sargero that the swelling in her hands and feet caused pain at a rate of "10 out of 10." (Tr. 505). Plaintiff reported that she had not been taking her insulin because she did not have insurance to pay for it. (*Id.*). In June 2013, plaintiff returned to Dr. Sargero complaining of pain in her feet. (Tr. 502). Dr. Sargero referred plaintiff to a podiatrist, Dr. Jonathan Moore, D.P.M., who treated plaintiff from June 2013 through August 2014. (Tr. 514-21, 709-783). On July 31, 2013, plaintiff underwent an electromyogram and nerve conduction study to evaluate her foot pain and numbness. (Tr. 515-16). The electromyogram was abnormal and revealed evidence of moderate sensory motor peripheral polyneuropathy. (Tr. 516). Dr. Moore assessed uncontrolled type 2 diabetes mellitus without complication. (Tr. 761). Plaintiff refused neuropathic medications, such as Neurontin, Lyrica, and Metanx, and stated that only pain medications helped her condition. (*Id.*).

In May 2014, Dr. Moore examined plaintiff for a fracture in the right foot, which happened after she missed a step while walking out of her house. (Tr. 753). Before the examination, plaintiff had visited the emergency room where doctors diagnosed a misplaced fracture. (*Id.*). Dr. Moore advised plaintiff to elevate her foot and avoid weight bearing. (Tr. 747). She returned to Dr. Moore for follow up visits in June 2014, July 2014, and August 2014 (Tr. 710-11; 717-19; 721-24; 726-29; 731-34; 738-41).

On July 25, 2014, plaintiff underwent a full body nuclear medicine bone scan. (Tr. 541). The scan showed increased activity in the lateral right ankle and marked increased activity in the proximal medial tibia at the level of the plateau. (*Id.*). The results were otherwise negative. (*Id.*).

In September 2015, plaintiff returned to the emergency room after reportedly falling on concrete and injuring her left hand. (Tr. 797, 800-07). As a result of the fall, plaintiff had multiple fractures to the fingers of her right hand and required surgery. (Tr. 802-04). Plaintiff attended hand therapy with an occupational therapist on September 22, 2015, who created a splint for her, and plaintiff returned to the occupational therapist for repair of the splint on September 29, 2015. (Tr. 797-801).

On July 3, 2015, plaintiff's physical therapist, Cynthia Lear, conducted a functional capacities evaluation of plaintiff at the Drake Center for Outpatient Physical Therapy at the request of Dr. Sargero. (Tr. 786-88). During the evaluation, plaintiff reported being able to sit 5-20 minutes until her legs get numb, stand 5-20 minutes, and walk 10 minutes. (Tr. 787). She reported that on a typical 11 hour day, she spends 3 hours moving, 2 hours sitting in a regular chair or couch, and 6 hours reclining or lying down. (*Id.*). Plaintiff reported that she has trouble lifting due to hand cramping and is unable to squat, crouch, or kneel due to her leg condition. (*Id.*). Plaintiff reported that she was never pain free and often falls as a result of bad neuropathy in her hands and feet. (*Id.*). During the evaluation, Ms. Lear assessed plaintiff's grip strength and observed that plaintiff was uncoordinated in trying to open and close her hands around a handheld grip dynamometer. (*Id.*). Ms. Lear had to support the weight of the dynamometer for plaintiff to perform the activity. (*Id.*). Ms. Lear assessed plaintiff's fine manipulation skills and noticed that plaintiff had difficulty picking up pegs and placing them in grooved holes due to the

9

reported tingling and numbness in her fingertips. (*Id.*). During a six-minute self-paced walking test, plaintiff walked slowly for two minutes with her cane and stated that she needed to sit because of increased pain in her legs. (Tr. 788). Plaintiff ascended stairs slowly with a moderate use of railings and descended stairs slowly with a heavy use of railings for support. (*Id.*). Plaintiff sat for approximately 40 minutes and stated that she needed to stand up due to pain. (*Id.*). Plaintiff was unable to pick up and move a four pound bean bag weight with one hand or grasp the bean bag with either hand during a lifting exercise. (*Id.*). Based on plaintiff's performance on other test items, Ms. Lear opted not to test plaintiff's performance in several other areas. (*Id.*). Ms. Lear concluded that plaintiff would be unlikely to sustain employment in a sedentary position on a part-time basis. (Tr. 786).

Ms. Lear also completed a physical residual functional capacity questionnaire on July 3, 2015. (Tr. 790-94). Ms. Lear identified clinical findings and objective findings to include significant decrease in grip strength and pain or numbness/tingling that limited all activities. Ms. Lear qualified her answer with the note "refer also to physician."[8] (Tr. 790). Ms. Lear opined that plaintiff's pain and other symptoms frequently interfere with the attention and concentration needed to perform simple work tasks. (Tr. 791). Ms. Lear noted that plaintiff could sit 20 minutes at one time and stand 5-10 minutes at one time. (Tr. 792). She opined that plaintiff could sit and stand/walk for less than 2 hours total in an eight-hour workday. (*Id.*). Ms. Lear indicated that plaintiff must walk 15-20 minutes three to four times in an eight-hour workday. (*Id.*). She opined that plaintiff needed a job that permits shifting positions at will from sitting, standing, or walking. (*Id.*). She estimated that plaintiff would frequently need to take five-minute unscheduled breaks during an eight-hour workday. (Tr. 792-93). Ms. Lear noted that plaintiff was unable to lift five pounds. (Tr. 793). She assessed the following physical

---

[8] Ms. Lear also deferred to plaintiff's physician in several other questionnaire items.

10

limitations: occasionally look down, turn head to right or left, look up, and hold head in static position; rarely twist, stoop, and climb stairs; and never crouch/squat or climb ladders. (*Id.*). Ms. Lear indicated that plaintiff was markedly limited in her low grip strength and was unable to complete testing in her hands, fingers, and arms due to her pain. (Tr. 794). Ms. Lear estimated that plaintiff would be absent from work more than four days per month as a result of her impairments or treatment. (*Id.*).

**E. Specific Errors**

On appeal, plaintiff asserts two assignments of error: (1) the ALJ improperly weighed the opinion of physical therapist Cynthia Lear and (2) the ALJ's RFC finding is not supported by substantial evidence with regard to the weight given to Dr. DeLuca's opinion. (Doc. 10 at 9-14).

**1. The ALJ properly weighed the opinion of plaintiff's physical therapist, Ms. Lear**

The ALJ afforded the opinion of Ms. Lear "little weight." (Tr. 21). The ALJ determined that Ms. Lear is "not an acceptable medical source and her report is inconsistent with the [plaintiff]'s prior examinations." (*Id.*). The ALJ further discounted Ms. Lear's opinion on the basis that she chose not to evaluate plaintiff's ability to perform numerous activities. (*Id.*, citing Tr. 788). The ALJ noted that Ms. Lear's evaluation "appear[ed] to be based primarily on the [plaintiff]'s self-reporting, rather than Ms. Lear's own examination." (*Id.*).

Plaintiff argues that the ALJ improperly weighed the opinion of Ms. Lear, who documented that plaintiff's pain limited her ability to complete a functional capacities evaluation and pointed out that the results of her testing were consistent with plaintiff's diagnoses, physical findings, and self-reports of her abilities and limitations. (*Id.* at 9). Plaintiff argues that Ms. Lear documented objective findings, which demonstrated that plaintiff had significant limitations in standing, walking, climbing stairs, sitting for extended periods of time, and gripping and

manipulating objects. (*Id.* at 10-11). Plaintiff contends that the ALJ erred in discounting Ms. Lear's opinion based on the notion that she opted out of testing plaintiff's abilities in certain areas. (*Id.* at 11-12). Plaintiff also contends that the ALJ erred in finding that Ms. Lear's opinion was inconsistent with her prior physical examinations and cites to instances in the record purportedly demonstrating that Ms. Lear's opinion was consistent with physical findings. (*Id.*) (citing Tr. 327, 515-16, 522-38, 709-83).

The Commissioner responds that the ALJ had broad discretion in weighing the opinion of Ms. Lear, who was a non-acceptable medical source. (Doc. 13 at 5). The Commissioner argues that the ALJ reasonably noted that Ms. Lear's opinion was inconsistent with plaintiff's prior examinations and cites to objective evidence showing moderate and negative findings. (*Id.*) (citing Tr. 515-16, 541). The Commissioner contends that the ALJ accurately found that Ms. Lear's testing was incomplete as it does not measure the full-range of plaintiff's abilities. (*Id.* at 5-6). The Commissioner also contends that the ALJ reasonably found Ms. Lear's opinion to be grounded in large part on plaintiff's subjective complaints, which the ALJ determined to not be entirely credible because even though she experienced neuropathic pain from her diabetes, she repeatedly indicated that she was noncompliant with her insulin and blood sugar control. (*Id.* at 6-7) (citing Tr. 20, 21, 354, 365, 761). Last, the Commissioner argues that Ms. Lear's opinion that plaintiff would be unable to work a sedentary job on a part-time basis is a legal conclusion reserved to the Commissioner. (*Id.* at 7).

Under the Social Security regulations, evidence from an "acceptable medical source" is required to establish the existence of a medically determinable impairment. 20 C.F.R. §§

416.913(a), 404.1513(a); SSR 06–03p, 2006 WL 2329939, at *2.[9] However, evidence from "other sources" as defined under the regulations may be used to show the severity of the claimant's impairment and how it affects the individual's ability to work. 20 C.F.R. § 416.913(d), 404.1513(d); SSR 06–03p. Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in a professional capacity include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. SSR 06-03p. *See also Cruse v. Comm'r of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). The ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6.

The ALJ's decision to give "little weight" to the opinion of Ms. Lear is supported by substantial evidence. The ALJ correctly assessed that Ms. Lear, a physical therapist, is not an "acceptable medical source" and therefore her opinion was not entitled to any special deference. (Tr. 21). "The opinion of a 'non-acceptable medical source' is not entitled to any particular weight or deference—the ALJ has discretion to assign it any weight he feels appropriate based on the evidence of record." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248-49 (6th Cir. 2015) (citing *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (ALJ has discretion to

---

[9] SSR 06-03p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-03p applies here.

determine proper weight to accord opinions from "other sources").

In addition, the ALJ appropriately considered the source of the information and the consistency of Ms. Lear's opinion with the other record evidence. Ms. Lear rendered her opinion based on a one-time, one-hour examination. (*Id.*). Further, the ALJ offered reasonable explanations for affording the opinion of Ms. Lear little weight: it was inconsistent with plaintiff's prior physical examinations, it was incomplete in that it did not evaluate plaintiff's ability to perform numerous activities, and it appeared to be based primarily on plaintiff's self-reporting rather than her own examination. (*Id.*).

Plaintiff takes issue with these reasons, pointing to evidence which purportedly supports Ms. Lear's assessment and offering an alternative explanation for Ms. Lear's decision to not fully test plaintiff's ability to perform several activities: "because PT Lear observed Plaintiff's poor performance on certain less strenuous tests, and realized that Plaintiff was *not capable* of performing the more intensive activities." (Doc. 10 at 12) (emphasis in original).

The ALJ's reasons are substantially supported by the record. The ALJ fully evaluated Ms. Lear's assessment for less than sedentary work and, in view of the record as a whole, reasonably determined it was entitled to little weight. The ALJ thoroughly reviewed the evidence of plaintiff's physical impairments and reasonably determined that despite those impairments, plaintiff retained the ability to sustain a range of sedentary work. In assessing plaintiff's functional abilities, the ALJ cited to objective evidence, including an EMG test showing evidence of moderate sensory motor peripheral polyneuropathy in plaintiff's lower extremities and a full body nuclear bone scan showing increased activity in the lateral right ankle with otherwise negative results. (Tr. 19). While plaintiff suggests these objective findings are in fact consistent with Ms. Lear's evaluation, there is no evidence any physician reviewed Ms.

14

Lear's test results, as specifically recommended by Ms. Lear, to corroborate them with available diagnostic test results. (Tr. 786). The ALJ also discounted Ms. Lear's opinion because she opted not to test plaintiff's ability to perform numerous activities. Whether Ms. Lear had a good reason for not evaluating certain abilities as plaintiff contends, the ALJ accurately noted that Ms. Lear's testing was incomplete. (Tr. 787-788). Moreover, given the admittedly incomplete testing in numerous areas, Ms. Lear was left only with plaintiff's subjective allegations in certain areas, which the ALJ declined to fully credit.

The ALJ adequately considered Ms. Lear's opinion and articulated several reasons for the weight he assigned to her assessment. The ALJ's decision to give Ms. Lear's opinion little weight is supported by substantial evidence. Accordingly, plaintiff's first assignment of error should be overruled.

## 2. Substantial evidence supports the ALJ's RFC determination.

Plaintiff argues that the ALJ erred in assessing her RFC because the functional limitations do not adequately incorporate the opinion of consultative examining psychologist Dr. DeLuca, the opinion in which the ALJ afforded "great weight." (Doc. 10 at 13). Plaintiff notes that Dr. DeLuca concluded that plaintiff "appeared to have intellectual limitations in her ability to maintain attention, concentration, persistence, and pace." (*Id.*, citing Tr. 498). Plaintiff alleges that the ALJ's RFC determination is inconsistent with Dr. DeLuca's opinion that she has a limited ability to respond to workplace stress. (*Id.* at 14). Plaintiff further alleges that the GAF score and other objective abnormalities assessed by Dr. DeLuca during the examination justify an RFC reflecting plaintiff's inability to tolerate stress. (*Id.*).

The Commissioner responds that the ALJ fully accommodated plaintiff's inability to deal with stress by limiting her to simple, routine, repetitive work with only occasional changes in job

15

duties and restricting her from work requiring a strict production pace or requiring skills beyond her intellectual functioning, including reading, writing, and arithmetic. (Doc. 13 at 11, citing Tr. 18). The Commissioner also contends that plaintiff misconstrues Dr. DeLuca's opinion regarding plaintiff's ability to tolerate stress. The Commissioner points out that while Dr. DeLuca opined that plaintiff's ability to manage stress would be limited, the "statement is vague because Dr. DeLuca did not state to what extent Plaintiff's ability to manage stress was limited, nor did she provide any specific functional limitations." (*Id.* at 12, citing Tr. 21, 498). The Commissioner maintains that the RFC determination is a responsibility reserved to the ALJ. (*Id.*) (citing 20 C.F.R. § 416.927(e)(1)).

The ALJ gave "great weight" to the opinion of consultative examining psychologist Dr. DeLuca. (Tr. 21). Dr. DeLuca opined that plaintiff appeared able to respond appropriately to others in a work setting, but she appeared to have limited ability to respond to workplace stress. (*Id.*). The ALJ noted that "[a]lthough [Dr. DeLuca's] opinion is somewhat vague, it is consistent with the record as a whole, and with Dr. DeLuca's examination." (*Id.*). The ALJ included the following mental functional limitations in the RFC finding:

> The [plaintiff] is limited to simple, routine, repetitive work with no strict production pace required. She should have no more than occasional changes to her job duties, and should not perform work that requires reading, writing, or arithmetic.

(Tr. 18).

The Social Security regulations vest the ALJ with the responsibility of assessing an individual's RFC. 20 C.F.R. § 404.1527(e)(2); 20 C.F.R. § 416.946(c); 20 C.F.R. § 416.927(d)(2) (the final responsibility for deciding an individual's RFC is reserved to the Commissioner). "Physicians render opinions on a claimant's RFC, but the ultimate responsibility for determining a claimant's capacity to work lies with the Commissioner." *Profitt*

*v. Comm'r. of Soc. Sec.*, No. 1:13-cv-679, 2014 WL 7660138, at *6 (S.D. Ohio Dec. 12, 2014) (Report and Recommendation), *adopted*, 2015 WL 248052 (S.D. Ohio Jan. 20, 2015) (citations omitted). An ALJ is not required to adopt a medical source's opinion on limitations verbatim in assessing a claimant's RFC. *See* SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment."). "Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). "Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). The ALJ is tasked with making an RFC determination, considering the medical opinions and all of the other evidence of record. 20 C.F.R. §§ 404.1546(c), 416.946(c); *Poe*, 342 F. App'x at 157 ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician.").

Here, considering the record as a whole, the ALJ's RFC finding adequately accounted for the limitations assessed by Dr. DeLuca. The ALJ did not omit restrictions against workplace stress. The ALJ included restrictions in the RFC assessment limiting plaintiff to "simple, routine, repetitive work with no strict production pace required" and "no more than occasional changes to her job duties." (Tr. 18). These restrictions more than adequately incorporate Dr. DeLuca's opinion that plaintiff's ability to manage stress associated with work would be "limited." (Tr. 498). *See Little v. Comm'r of Soc. Sec.*, No. 2:14-cv-532, 2015 WL 5000253, at

*14 (S.D. Ohio Aug. 24, 2015) ("a low-stress environment is typically 'defined as one free of fast-paced production or quota requirement'") (quoting *Huffman v. Astrue*, No. 2:10-cv-031, 2011 WL 1002096, at *6 (S.D. Ohio Jan. 24, 2011), *adopted*, 2011 WL 1002721 (S.D. Ohio Mar. 17, 2011)). Any difference between the limitations assessed by Dr. DeLuca and by the ALJ in this area is imperceptible and simply a matter of semantics. Moreover, as the Commissioner notes, Dr. DeLuca's opinion did not assess any specific functional limitations associated with plaintiff's ability to manage stress at work (Doc. 13 at 12) and, therefore, the ALJ formulated a reasonable RFC based on Dr. DeLuca's ambiguous opinion. Plaintiff has not shown the ALJ erred by failing to adopt all of the restrictions assessed by Dr. DeLuca, nor has she cited any legal authority in support of her argument that the RFC was inconsistent with Dr. DeLuca's opinion. Accordingly, plaintiff's second assignment of error should be overruled.

## III. Conclusion

In sum, substantial evidence supports the weight given to plaintiff's physical therapist. Substantial evidence also supports the ALJ's RFC determination and the consideration given to the limitations assessed by the consultative examining psychologist.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and this case be closed on the docket of the Court.

Date: 2/2/18

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

THERESA M. GILBERT,
Plaintiff,

Case No. 1:17-cv-144
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).